# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

MARK GROESCHEL,

    Plaintiff,

    v.

ARRAY BIOPHARMA INC., CARRIE S. COX, CHARLES M. BAUM, GWENDOLYN A. FYFE, KYLE A. LEFKOFF, JOHN A. ORWIN, SHALINI SHARP, RON R. SQUARER, and GIL J. VAN LUNSEN,

    Defendants.

## COMPLAINT FOR VIOLATION OF SECTIONS 14(d)(4), 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Mark Groeschel ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Array Biopharma, Inc. ("Array" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Array, the "Defendants") for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9"). Plaintiff's claims arise in connection with the proposed tender offer by Arlington Acquisition Sub Inc. ("Purchaser"), a direct subsidiary of Pfizer, Inc. ("Parent") and an indirect wholly owned subsidiary of Pfizer, to acquire all of the issued and outstanding shares of Array (the "Tender Offer").

2.  On June 14, 2019, Array entered into an Agreement and Plan of Merger (the "Merger Agreement") by and among the Company, Parent, Purchaser and, solely for the purposes of Section 7.02 and Article XI thereto, Pfizer, pursuant to which Purchaser will merge with and into the Company, with the Company continuing as the surviving corporation and a wholly owned subsidiary of Parent (the "Proposed Transaction").

3.  Under the terms of the Merger Agreement, each stockholder of Array common stock will be entitled to receive $48.00 in cash (the "Offer Price").

4.  On June 28, 2019, in order to convince Array' public common stockholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the SEC.

5.  In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) financial projections for Array; and (ii) the valuation analyses performed by Array' financial advisor, Centerview Partners ("Centerview"), in support of its fairness opinion.

6.  The Tender Offer is scheduled to expire at 12:00 a.m. Eastern Time, on July 27, 2019 (the "Expiration Time"). It is imperative that the material information that has been omitted

from the Recommendation Statement is disclosed to the Company's stockholders prior to the Expiration Time so they can properly determine whether to tender their shares.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9. Plaintiff seeks to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Array' public common stockholders sufficiently in advance of the Expiration Time or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with Colorado as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because (i)Defendants are found or are inhabitants or transact business in this District; (ii) the conduct at issue had an effect in this District; and (iii) Defendants have received substantial compensation via Array by doing business through, with and for Array, which is headquartered in this District.

## PARTIES

11. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Array common stock.

12. Defendant Array Biopharma Inc. ("Array") is a Delaware corporation with its principal place of business located at 3200 Walnut Street, Boulder, Colorado 80301. The Company researches, develops, and commercializes small molecule drugs intended to improve the health and lives of patients and lower overall healthcare costs. Array's common stock trades on the Nasdaq under the ticker symbol "ARRY"

13. Defendant Carrie S. Cox is, and has been at all relevant times, a director of the Company. Defendant Cox also currently serves as Chairman of the Board.

14. Defendant Charles M. Baum is, and has been at all relevant times, a director of the Company. Defendant Baum also currently serves as President of the Company.

15. Defendant Gwendolyn A. Fyfe is, and has been at all relevant times, a director of the Company.

16. Defendant Kyle A. Lefkoff is, and has been at all relevant times, a director of the Company.

17. Defendant John A. Orwin is, and has been at all relevant times, a director of the Company.

18. Defendant Shalini Sharp is, and has been at all relevant times, a director of the Company.

19. Defendant Ron R. Squarer is, and has been at all relevant times, a director of the Company. Defendant Squarer also currently serves as the Chief Executive Officer of the Company.

20. Defendant Gil J. Van Lunsen is, and has been at all relevant times, a director of the Company.

21. The defendants identified in paragraphs 13 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Array, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.   Background of the Company and the Proposed Transaction**

22. Array researches, develops, manufactures, and commercializes regenerative medicine products intended to improve the health and lives of patients and lower overall healthcare costs. The Company has achieved commercial success with Braftovi and Mektovi, drugs designed to treat melanoma. Array continues to advance its research and development ("R&D") by focusing on the discovery of new cancer treatments. It currently has several drugs in its R&D pipe-line.

23. Pfizer is a American multinational medical equipment manufacturing company headquartered in New York, New York. Pfizer is an international producer of drugs and vaccines.

24. On June 14, 2019, the Board caused the Company to enter into the Merger Agreement.

25. Pursuant to the terms of the Merger Agreement, the Company's current stockholders only expect to receive $48.00 in cash for each share of Array common stock they own.

26. On June 17, 2019, the Company issued a press release announcing the Proposed Transaction, which stated in relevant part:

> NEW YORK & BOULDER, Colo.--(BUSINESS WIRE)--Jun. 17, 2019-- Pfizer Inc. (NYSE: PFE) and Array BioPharma Inc. (NASDAQ: ARRY) today announced that they have entered into a definitive merger agreement under which Pfizer will acquire Array,

a commercial stage biopharmaceutical company focused on the discovery, development and commercialization of targeted small molecule medicines to treat cancer and other diseases of high unmet need. Pfizer has agreed to acquire Array for $48 per share in cash, for a total enterprise value of approximately $11.4 billion. The Boards of Directors of both companies have approved the merger.

This press release features multimedia. View the full release here: https://www.businesswire.com/news/home/20190617005373/en/

Array's portfolio includes the approved combined use of BRAFTOVI® (encorafenib) and MEKTOVI® (binimetinib) for the treatment of BRAFV600E or BRAFV600K mutant unresectable or metastatic melanoma. The combination therapy has significant potential for long-term growth via expansion into additional areas of unmet need and is currently being investigated in over 30 clinical trials across several solid tumor indications, including the Phase 3 BEACON trial in BRAF-mutant metastatic colorectal cancer (mCRC).

In the U.S., colorectal cancer is the third most common type of cancer in men and women. An estimated 140,250 patients were diagnosed with cancer of the colon or rectum in 2018, and approximately 50,000 are estimated to die of their disease each year.1BRAF mutations are estimated to occur in up to 15% of colorectal cancer cases and represent a poor prognosis for these patients.

"Today's announcement reinforces our commitment to deploy our capital to bring breakthroughs that change patients' lives while creating shareholder value," said Albert Bourla, chief executive officer of Pfizer. "The proposed acquisition of Array strengthens our innovative biopharmaceutical business, is expected to enhance its long-term growth trajectory, and sets the stage to create a potentially industry-leading franchise for colorectal cancer alongside Pfizer's existing expertise in breast and prostate cancers."

In addition to the combination therapy for BRAF-mutant metastatic melanoma, Array brings a broad pipeline of targeted cancer medicines in development, as well as a portfolio of out-licensed potentially best-in-class and/or first-in-class medicines, which are expected to generate significant royalties over time.

"We are incredibly proud that Pfizer has recognized the value Array has brought to patients and our remarkable legacy discovering and advancing molecules with great potential to impact and extend the lives of patients in critical need," said Ron Squarer, Array chief

executive officer. "Pfizer shares our commitment to patients and a passion for advancing science to develop even more options for individuals with unmet needs. We're excited our team will have access to world-class resources and a broader research platform to continue this critical work."

In May 2019, Array announced results from the interim analysis of the Phase 3 BEACON mCRC trial: The second-or-third-line treatment with the BRAFTOVI triplet combination (BRAFTOVI + MEKTOVI + cetuximab) showed statistically significant improvement in overall response rate and overall survival compared to the control group, reducing the risk of death by 48%. The triplet combination could be the first chemotherapy-free, targeted regimen for patients with BRAF-mutant mCRC. Array intends to submit these data for regulatory review in the United States in the second half of 2019.

"We are very excited by Array's impressive track record of successfully discovering and developing innovative small-molecules and targeted cancer therapies," said Mikael Dolsten, Pfizer chief scientific officer and president, Worldwide Research, Development and Medical. "With Array's exceptional scientific talent and innovative pipeline, combined with Pfizer's leading research and development capabilities, we reinforce our commitment to advancing the most promising science, regardless of whether it is found inside or outside of our labs."

Upon the close of the transaction, Array's employees will join Pfizer and continue to be located in Cambridge, Massachusetts and Morrisville, North Carolina, as well as Boulder, Colorado, which becomes part of Pfizer's Oncology Research & Development network in addition to La Jolla, California and Pearl River, New York.

Pfizer expects to finance the majority of the transaction with debt and the balance with existing cash. The transaction is expected to be dilutive to Pfizer's Adjusted Diluted EPS by $0.04 -$0.05 in 2019, $0.04 -$0.05 in 2020, neutral in 2021, and accretive beginning in 2022, with additional accretion and growth anticipated thereafter. Pfizer will provide any appropriate updates to its current 2019 guidance in conjunction with its third quarter 2019 earnings release.

Under the terms of the merger agreement, a subsidiary of Pfizer will commence a cash tender offer to purchase all outstanding shares of Array common stock for $48 per share in cash for a total

7

enterprise value of approximately $11.4 billion. The closing of the tender offer is subject to customary closing conditions, including regulatory approvals and the tender of a majority of the outstanding shares of Array common stock (on a fully-diluted basis). The merger agreement contemplates that Pfizer will acquire any shares of Array that are not tendered into the offer through a second-step merger, which will be completed promptly following the closing of the tender offer. Pfizer expects to complete the acquisition in the second half of 2019.

## II. The Recommendation Statement Omits Material Information

27. On June 28, 2019, Defendants filed a materially incomplete and misleading Recommendation Statement with the SEC. The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Recommendation Statement misrepresents or omits material information that is necessary for Array' public common stockholders to make an informed decision concerning whether to tender their shares, in violation of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9.

28. First, the Recommendation Statement fails to fully disclose Array's financial projections.

29. Specifically, the Recommendation Statement does not disclose (i) all line-items used to calculate Unlevered Free Cash Flow or ("UFCF"); (ii) all line-items used to calculate EBIT and (iii) a reconciliation of non-GAAP with GAAP metrics.

30. Contrary to GAAP metrics, non-GAAP figures are not standardized and, consequently, can be manipulated and easily taken out of context. The lack of GAAP reconciliation combined with the lack of line-items used to calculated EBIT and UFCF renders the projections incomplete and inaccurate.

31. Second, the Recommendation Statement describes Centerview's fairness opinion and the various valuation analyses performed in support of its opinion omits important information. This omitted information, if disclosed, would significantly alter the total mix of information available to Array's common stockholders.

32. With respect to Centerview's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose the following key components used in the analysis: (i) the implied terminal value of the Company; (ii) the inputs and assumptions underlying the perpetuity growth rate of 0% and (iii) the inputs and assumptions underlying the discount rate range of 9.5% to 11.5%. *See* Recommendation Statement at 33.

33. These key inputs are material to Array's stockholders, and their omission renders the summary of Centerview's *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow ("DCF") analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…* This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight***

> ***assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, Array stockholders cannot evaluate for themselves the reliability of Centerview's *Discounted Cash Flow Analysis*.

34. With respect to Centerview's *Selected Public Company Analysis*, the Recommendation Statement fails to disclose the individual valuation multiples Cantor Fitzgerald calculated for each of the companies considered in the analysis. *See* Recommendation Statement at 30-31. A fair summary of the *Selected Public Companies Analysis* requires the disclosure of the individual valuation multiples for each company utilized. In addition, the analysis fails to provide low, high, mean, and median equity values. Additionally, the analysis states the following: "because, none of the selected companies is exactly the same as Array, Centerview believed it was inappropriate to, and therefore did not, rely soley on the quantitative results of the selected public company analysis. Accordingly Centerview also made qualitative judgements, based on its experience and professional judgement, concerning differences between the operational, business, and/or financial characteristics of Array." *See* Recommendation Statement at 30-31 Nowhere in the Recommendation Statement does Centerview disclose what factors were used in making this "qualitative" assessment. Shareholders therefore cannot determine if the companies selected for this analysis can actually be considered 'peers' of Array.

35. Similarly, with respect to Centerview's *Selected Transactions Analysis*, the Recommendation Statement fails to disclose the individual valuation multiples Centeview calculated for each of the companies considered in the analysis. *See* Recommendation Statement

at 32. Likewise, the analysis states that Centerview used qualitive factors while selecting the transactions used in this analysis. The only elaboration about these qualitative was that "size and other factors" were considered. Shareholders therefore cannot determine if the transactions selected of this analysis are actually comparable to the transaction at issue.

36. Third, the Recommendation Statement does not disclose whether the Company entered into any confidentiality agreements containing Standstill and/or "Don't Ask, Don't Waive" or "DADW" provisions. Shareholders must be made aware of whether counterparties were prevented from making a superior offer in order to make an informed vote.

37. Defendants' failure to provide the foregoing material information renders the statements in the Recommendation Statement false and/or materially misleading.

38. In sum, the omission of the above-referenced information renders the Recommendation Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Expiration Time, Plaintiff will be unable to make an informed decision concerning whether to tender his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violation of Section 14(e) of the Exchange Act)**

39. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not

misleading…" 15 U.S.C. §78n(e).

41. Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42. The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer and the intrinsic value of the Company.

43. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e). The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

44. The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable investor would view the

information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

45. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

46. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Time.

## COUNT II

**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)**

47. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48. Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

49. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation

for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

50. SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

51. In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

52. The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9(d) if other SEC regulations specifically require disclosure of the omitted information.

53. The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the

Recommendation Statement materially incomplete and therefore misleading.

54. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## COUNT III

**(Against all Defendants for Violations of Section 20(a) of the Exchange Act)**

55. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56. The Individual Defendants acted as controlling persons of Osiris within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Array, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

57. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Tender Offer. They were thus directly involved in preparing the Recommendation Statement.

59. In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

60. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

61. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

62. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: July 8, 2019  **MONTEVERDE & ASSOCIATES PC**

 By: */s/ Juan E. Monteverde*
  Juan E. Monteverde
  The Empire State Building
  350 Fifth Avenue, Suite 4405
  New York, NY 10118
  Tel:(212) 971-1341
  Fax:(212) 202-7880
  Email: jmonteverde@monteverdelaw.com

 *Attorneys for Plaintiff*